UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KEIONA ELLIOTT, | ) | |
| | ) | |
| Plaintiff, | ) | 20 C 2706 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| BOARD OF EDUCATION OF THE CITY OF | ) | |
| CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Keiona Elliott sued her employer, the Board of Education of the City of Chicago, alleging that it subjected her to a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and is responsible for her harasser's intentional infliction of emotional distress on her, in violation of state law. Doc. 1. (The complaint's request for punitive damages has been dismissed by agreement. Doc. 77.) With discovery complete, the Board moves for summary judgment, and to deem certain facts admitted and to strike other facts. Docs. 74, 83. The motions are granted in part and denied in part.

**Background**

The court sets forth the facts as favorably to Elliott as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). In so doing, the court resolves under Civil Rule 56(c) and (e) and Local Rule 56.1 the Board's motion to strike certain facts and to deem other facts admitted. At this juncture, the court must assume the truth of the following facts but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

Elliott was hired as a School Security Officer ("SSO") at Al Raby High School on April 7, 2015. Doc. 76 at ¶ 1. Elliott was hired by the Board, which maintains the Chicago Public Schools ("CPS") school system. *Id*. at ¶¶ 1,13.

On Elliott's first day of work, Joe Barr, another SSO at Al Raby, asked her to walk up and down the stairs; after she did so, he explained that he "just wanted to see [her] come down the stairs." *Id*. at ¶¶ 11, 39; Doc. 81 at p. 19, ¶ 7. A few days later, Barr told Elliott that she "had a nice rack" and asked her what size her breasts were. Doc. 76 at ¶ 40; Doc. 81 at p. 19, ¶ 8.

Elliott reported Barr's behavior and comments to Chauntina Haskin, Al Raby's Dean of Students at the time, who told Elliott that she would take care of it. Doc. 76 at ¶ 43; Doc. 81 at p. 19, ¶ 9. Several days later, Al Raby's principal, Femi Skanes, held a meeting with the security staff to review the school's sexual harassment policy. Doc. 76 at ¶¶ 6, 45. Skanes testified at her deposition that the meeting was "part of [her] routine administrative responsibilities" as "part of an ongoing routine" and was not held because of Elliott's complaint, of which Skanes was unaware. Doc. 76-4 at 9-10. Barr did not harass Elliott for the remainder of the 2014-2015 school year, which ended on June 16. Doc. 76 at ¶¶ 38, 42.

Barr told Elliott and other SSOs that he was their supervisor and treated them as such, and he was listed as "head of security" on schedules and documents given to them. Doc. 81 at pp. 18-19, ¶¶ 2-3. Elliott understood that Barr could make recommendations regarding demotions and discipline. *Id*. at p. 19, ¶ 5. Barr did not, however, have the authority to hire, fire, promote, or demote employees. Doc. 76 at ¶ 11.

The Board adopted a Comprehensive Non-Discrimination Title IX and Sexual Harassment Policy in 2012 and updated it in 2016. *Id*. at ¶ 17. (The two versions are the same in all material respects, so the court will quote the language of the 2016 policy). The Board's

Equal Opportunity Compliance Office ("EOCO") is responsible for implementing the policy and investigating allegations of sexual harassment. *Id*. at ¶ 18. Section IV.C of the policy states in relevant part:

> For employees, contractors, consultants, vendors and volunteers[,] complaints of discrimination, sexual harassment or retaliation shall be made to any of the following persons:
>
> 1. The Principal, administrator in charge or the assistant principal of the school in which the Complainant works;
> 2. The department head of the Complainant's office …; or
> 3. The EOCO Administrator or EOCO Investigator.

*Id*. at ¶ 26, § IV.C. The policy also states that "[a]ny school principal, administrator in charge, assistant principal or department head … receiving an oral or written complaint alleging discrimination, sexual harassment or retaliation by an employee … must refer it to the EOCO for handling within three (3) business days following receipt or knowledge of the allegations." Doc. 76-11 at 5-6, § IV.E. SSOs are members of CPS's Office of School Safety and Security, of which Jadine Chou is the department head. Doc. 76 at ¶¶ 32-33.

Barr resumed making inappropriate comments to Elliott at the start of the 2015-2016 school year. *Id*. at ¶ 50. From then until March 17, 2017, he told Elliott two to three times per week that she had a "nice rack," that he wondered what her breasts tasted like, that he "bet you" they were soft, and that he wanted to touch them and put them in his mouth. *Ibid*.; Doc. 81 at p. 19, ¶ 8. Barr would also say "got milk?" to Elliott, ask her the size of her bra, and act like he was drooling when she approached. Doc. 81 at p. 19, ¶ 8. He also asked Elliott out repeatedly and suggested that he could follow her home in his car so that nobody would know. *Ibid*.

A few weeks after the start of the 2015-2016 school year, Elliott reported Barr's comments to D'Angelo Dereef—who had succeeded Haskin as Al Raby's Dean of Students and who also served as its Athletic Director—who she believed was her supervisor and a department

head.  Doc. 76 at ¶ 9; Doc. 81 at p. 19, ¶¶ 6, 10-11.  As Athletic Director, Dereef was the director

of the athletics department, and Skanes considered him to be a department head.  Doc. 81 at

p. 21, ¶ 31.  Skanes explained, however, that it was somewhat difficult to determine who exactly

was a department head, that "departments at schools are very loose," and that Dereef was "not

the head of a CPS department."  *Ibid*.; Doc. 76 at ¶ 37.

Before being hired, Elliott had been interviewed by Dereef, and when she was hired, she

was told to report to Dereef, as he was "over security."  Doc. 81 at p. 18, ¶ 1.  Elliott reported her

work absences directly to Dereef, *id*. at p. 19, ¶ 4, and reported to him in general, *id*. at p. 19, ¶ 6.

Elliott understood that Dereef could make disciplinary recommendations and that he worked

collaboratively with Skanes on performance reviews.  *Id*. at p. 19, ¶ 5.  Dereef did not, however,

have the authority to hire, fire, promote, or demote employees.  Doc. 76 at ¶ 10.

When Elliott first reported Barr's behavior to Dereef, Dereef told her that he would talk

to Barr and take care of it.  Doc. 81 at p. 20, ¶ 13.  Barr's harassment did not stop, and Elliott

reported the continued harassment to Dereef every two to three weeks.  *Id*. at p. 20, ¶ 14.  Dereef

repeatedly told Elliott that he would talk to Barr about his inappropriate behavior, but Barr's

behavior did not let up.  *Id*. at p. 20, ¶ 17.  Elliott believed that she was following school policy

by reporting Barr's misconduct to Dereef, and Dereef never suggested that he was the wrong

person to report to or that she should report the harassment to someone else.  *Id*. at p. 19, ¶ 12.

Rather, Dereef directed Elliott to report any problems to him and told her that he was a

department head.  *Ibid*.  Due to Elliott's continuing complaints, Dereef eventually directed her to

report in her capacity as an SSO directly to him instead of to Barr.  *Id*. at p. 20, ¶ 16.

On March 17, 2017, Barr grabbed Elliott's breast.  Doc. 76 at ¶ 55.  Elliott immediately

reported the incident to Dereef, who in turn reported it to Skanes.  *Id*. at ¶¶ 55, 57.  Skanes spoke

with Elliott about the incident and asked whether she wanted to submit an official complaint. *Id.* at ¶¶ 58, 60. That was the first time Elliott had reported Barr's harassment to Skanes. *Id.* at ¶ 59. Barr's harassment stopped after March 17. *Id.* at ¶ 77.

On March 22, Elliott submitted a written complaint to Skanes; two days later, Skanes forwarded the complaint to the EOCO. *Id.* at ¶¶ 61-62. That was the first time the EOCO had been informed of Barr's harassment of Elliott. *Id.* at ¶ 63. The EOCO responded to Elliott that day and provided her with the forms required to initiate a formal EOCO complaint. *Id.* at ¶ 64.

Elliott submitted the forms to the EOCO on May 1. *Id.* at ¶ 65. The next day, Skanes provided Elliott with the phone number of Corrinne Leak, the EOCO investigator assigned to her case. *Id.* at ¶ 66. Skanes also followed up with Leak on Elliott's behalf, and Leak began her investigation. *Id.* at ¶¶ 66-67. Skanes and her assistant principal provided Leak with space at Al Raby to interview staff. *Id.* at ¶ 68. Leak interviewed Elliott, Dereef, and Barr, as well as five other Al Raby staff, between May 10 and approximately June 6. *Id.* at ¶ 69.

Elliott was required to keep working with Barr after March 17. Doc. 81 at p. 20, ¶ 18. At one point, Elliott asked Leak to be transferred from Al Raby, but Leak said that Elliott should not have to leave the school, as she was not the problem. Doc. 76 at ¶ 70. On June 20, while the EOCO investigation was ongoing, Barr retired. *Id.* at ¶ 72. On July 17, the EOCO concluded its investigation and found that Elliott's complaint was substantiated. *Id.* at ¶ 73. Accordingly, the Board designated Barr as ineligible to be hired by or to volunteer for the Board ever again. *Id.* at ¶ 75. Skanes advised Dereef that Barr was not allowed to participate in any activities at Al Raby, including any volunteer coaching, and was not allowed on Al Raby's premises. *Id.* at ¶ 76.

Barr's harassment caused Elliott to feel depressed, stressed, guarded, self-conscious, and not want to go to work. Doc. 81 at p. 20, ¶ 19. She continues to feel the effects of the harassment; for instance, she does not like it when men get close to her. *Id.* at p. 20, ¶ 20.

Elliott filed a charge with the Equal Employment Opportunity Commission ("EEOC") on September 20, 2017. Doc. 76 at ¶ 14. She filed this suit on May 5, 2020. *Id.* at ¶ 15.

## Discussion

As noted, Elliott brings a Title VII hostile work environment claim and a state law intentional infliction of emotional distress ("IIED") claim.

## I.      Title VII Hostile Work Environment Claim

Title VII's antidiscrimination provision makes it "unlawful … for an employer … to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The provision protects against "the creation of a hostile work environment that is severe or pervasive enough to affect the terms and conditions of employment." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir. 2016) (internal quotation marks omitted). To survive summary judgment on a sex-based hostile work environment claim, a plaintiff must adduce evidence sufficient for a reasonable jury to find "that she was: (1) subjected to unwelcome sexual conduct, advances, or requests; (2) because of her sex; (3) that were severe or pervasive enough to create a hostile work environment; and (4) that there is a basis for employer liability." *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008) (internal quotation marks omitted).

Focusing on the third and fourth elements, the Board contends that Barr's comments to Elliott during the 2014-2015 school year were not severe or pervasive enough to create a hostile work environment, and that there is no basis for employer liability for Barr's behavior during any

time period. Doc. 75 at 5-11. The Board also argues that any claim based on harassment that occurred before November 24, 2016 is time-barred under the statute of limitations. *Id*. at 4.

## A. Statute of Limitations

A plaintiff in Illinois who wishes to bring a Title VII claim must first file an administrative charge with the EEOC within 300 days of the alleged unlawful employment practice. *See* 42 U.S.C. § 2000e-5(e); *Boston v. U.S. Steel Corp*., 816 F.3d 455, 463 (7th Cir. 2016); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014). Failure to file a charge within that time renders the claim untimely. *See Boston*, 816 F.3d at 463. The Board argues that because Elliott filed her EEOC charge on September 20, 2017, she cannot bring a Title VII claim arising from pre-November 24, 2016 conduct. Doc. 75 at 4. Elliott responds that the continuing violation doctrine allows her Title VII claim to encompass that earlier conduct. Doc. 80 at 1-2. Elliott is correct.

In *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), the Supreme Court held that the continuing violation doctrine does not apply to "discrete" and easily identifiable acts "such as … failure to promote," even if those acts are related to earlier discriminatory or retaliatory acts over a continuous period. *Id*. at 110-14. Thus, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Id*. at 113. By contrast, hostile work environment claims involve the accumulation of repeated conduct over time, and thus "[i]n order for [a] charge [alleging hostile work environment] to be timely, the employee need only file [it] within … 300 days of any act that is part of the hostile work environment." *Id*. at 118; *see also Bass*, 746 F.3d at 839 (discussing the distinction between discrete and cumulative violations); *Adams v. City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) ("[*Morgan*] distinguished claims involving

discrete acts of discrimination from claims alleging a hostile work environment: Hostile

environment claims are different in kind from discrete acts.  Their very nature involves repeated

conduct.") (internal quotation marks omitted) (quoting *Morgan*, 536 U.S. at 115).  It follows that

the continuing violation doctrine applies to Elliott's hostile work environment claim.

Pressing the contrary result, the Board argues that Skanes's Spring 2015 meeting with

security staff about the school's sexual harassment policy was an "intervening act rendering

further harassment 'no longer part of the same hostile work environment claim.'"  Doc. 83 at 4

(quoting *Morgan*, 536 U.S. at 118).  True enough, "prompt and appropriate corrective action

reasonably likely to prevent the harassment from recurring … [can] suffice[] to sever a hostile

work environment claim."  *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 853 (7th

Cir. 2019).  However, an "incidental" action by the employer "not calculated to address the

harassment does not necessarily affect a hostile work environment claim against the employer."

*Id*. at 854.  As Skanes's meeting with the security staff did not occur in response to Barr's

alleged harassment, but rather was a routine review of the school's sexual harassment policy, it

was not a "corrective action" and "not calculated to address the harassment."  *Id*. at 853-54.  The

meeting therefore does not prevent application of the continuing violation doctrine.  *See ibid*.

Next, the Board argues that Barr's pre-November 24, 2016 misconduct is "not part of the

same employment practice[,] but rather discrete instances separated by large swaths of time, gaps

in employment, [and] different school years" because he did not make any comments to Elliott

from April 15, 2015 through June 16, 2015 or over summer breaks.  Doc. 83 at 4.  That Barr did

not make inappropriate comments for two months at the end of the 2014-2015 school year and

over summer breaks does not convert his harassment into "different episodes of unlawful

harassment" that have "'no relation' to each other under *Morgan*."  *Ford*, 942 F.3d at 854

(quoting *Morgan*, 536 U.S. at 118). Episodes of harassment comprise "isolated incidents," rather than "continuous conduct," only where there are years-long gaps between them. *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 713 (7th Cir. 2017) (holding that the continuing violation doctrine did not apply where there was a gap of "two or three years" between episodes of harassment); *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 709 (7th Cir. 2002) (same, where there was a "six-year, three-year and two-year gap, respectively, between each discrete act" of discrimination). There were no such gaps here.

Accordingly, under the continuing violation doctrine, Elliott's Title VII claim may rest on all of Barr's alleged misconduct, including his pre-November 24, 2016 conduct.

## B. Severe or Pervasive Harassment

The "severe or pervasive" element of a hostile work environment claim is phrased "in the disjunctive—the conduct must be *either* severe *or* pervasive." *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011), *aff'd*, 570 U.S. 421 (2013). This means that "one extremely serious act of harassment could rise to an actionable level[,] as could a series of less severe acts." *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013) (internal quotation marks omitted). A court addressing whether harassment is "severe or pervasive" must consider "factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016); *see also Johnson*, 892 F.3d at 900 (similar). In so doing, the court must bear in mind that Title VII does not impose a "general civility code" and that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted). That said, "the [work] environment need not reach the

point of 'hellishness'" to be actionable. *Johnson*, 892 F.3d at 901; *accord Gates*, 916 F.3d at 637

("While a 'hellish' workplace is surely actionable, plaintiffs' evidence need not show a descent

into the Inferno."). "Whether harassment was so severe or pervasive as to constitute a hostile

work environment is generally a question of fact for the jury." *Johnson*, 892 F.3d at 901.

The Board argues that Barr's behavior during the 2014-2015 school year did not amount

to "severe or pervasive" harassment because he made inappropriate comments on only two

occasions that year: when he asked Elliott to walk up and down the stairs "to see [her] come

down," and when he told her that she "had a nice rack" and asked about the size of her breasts.

Doc. 75 at 5; Doc. 76 at ¶¶ 39-40; Doc. 81 at p. 19, ¶¶ 7-8. But the 2014-2015 school year is not

the appropriate timeframe. As noted, *Morgan* holds that "the 'very nature' of hostile work

environment claims involves 'repeated conduct' that 'may not be actionable on its own.' Rather,

'[s]uch claims are based on the cumulative effect of individual acts' … [i]n contrast to discrete

acts of discrimination." *Lucas v. CTA*, 367 F.3d 714, 724 (7th Cir. 2004) (quoting *Morgan*, 536

U.S. at 118). Accordingly, the pertinent question is not whether Barr's comments during the

2014-2015 school year rose to the level of "severe or pervasive" harassment, but whether a

reasonable jury could find that *all* his conduct towards Elliott did so.

The answer to that question is yes—indeed, the Board concedes for purposes of summary

judgment that Barr's behavior from September 2015 through the beginning of the 2016-2017

school year qualifies as severe or pervasive harassment. Doc. 75 at 7 n.3. Even setting aside

Barr's grabbing Elliott's breast—of which more below—for nearly two years, two to three times

per week, Barr made grossly inappropriate comments to Elliott about her appearance, acted like

he was drooling when she approached, and harangued her about going out with him. Doc. 76 at

¶ 50; Doc. 81 at p. 19, ¶ 8. There is no question that a reasonable jury could find that his

persistent, sordid comments rose to the level of severe or pervasive harassment. *See Orton-Bell v. Indiana*, 759 F.3d 768, 774-75 (7th Cir. 2014) (holding that a "constant barrage of sexually charged comments" was sufficiently severe or pervasive).

### C.  Employer Liability

In determining whether there is a basis for employer liability, the court "must first decide whether the alleged harassment was perpetrated by supervisors or coworkers." *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017) (internal quotation marks omitted). If the harasser was the plaintiff's supervisor, then the employer "is strictly liable" for the harassment. *Ibid*. If the harasser "was merely a coworker," then the employer "is liable only if it was negligent either in discovering or remedying the harassment." *Ibid*. (internal quotation marks omitted).

### 1.  Strict Liability

For purposes of strict liability under Title VII, a supervisor is someone with "the power to directly affect the terms and conditions of the plaintiff's employment," including "the authority to hire, fire, promote, demote, discipline or transfer [the] plaintiff." *Ibid*. (internal quotation marks omitted). "Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes [of] imputing liability to the employer." *Parkins v. Civ. Constructors of Ill., Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998). An employee who "merely ha[s] authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).

Elliott submits that the Board is strictly liable for Barr's harassment because both Barr and Dereef were supervisors. Doc. 80 at 6-8. That argument is incorrect. For purposes of strict

liability, it does not matter whether Dereef was a supervisor, as he was not Elliott's harasser. *See Vance*, 646 F.3d at 469 ("Employers are strictly liable for harassment *inflicted by supervisors* … .") (internal quotation marks omitted) (emphasis added). And Barr, the alleged harasser, was not a supervisor, as he did not have the authority to hire, fire, promote, or demote employees. Doc. 76 at ¶ 11. That Barr *acted* as if he was Elliott's supervisor, called himself "head of security," and led Elliott to believe that he could make recommendations regarding demotions and discipline, do not warrant a different result. *See Rhodes*, 359 F.3d at 506 (holding that harassers who "managed [the plaintiff's] work assignments, investigated complaints and disputes, and made recommendations concerning sanctions for rule violations" were not supervisors, as they lacked "the authority to hire, fire, promote, demote, discipline or transfer"); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002) (holding that a harasser who "(1) possessed the authority to direct [the plaintiff's] work operations …; (2) provided input into her performance evaluations, and (3) was charged with training her and other less experienced employees" was not a supervisor, as he lacked "the authority to hire, fire, demote, promote, transfer, or discipline") (internal quotation marks omitted), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

Accordingly, the Board is not strictly liable for Barr's alleged harassment.

### 2. Negligence

As noted, when the harasser is the plaintiff's co-worker, the employer is liable "only if it was negligent either in discovering or remedying the harassment." *Nischan*, 865 F.3d at 930 (internal quotation marks omitted). An employer is negligent in remedying harassment if "it failed to take prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 898 (7th

Cir. 2016) (internal quotation marks omitted).  The employer's "notice or knowledge of the harassment is a prerequisite for liability." *Parkins*, 163 F.3d at 1035.

If the employer has an internal procedure for reporting harassment, a complainant can put the employer on notice of harassment in two ways: she can "either follow[] the harassment policy reporting requirements" or "report[] the alleged harassment to anyone who ha[s] the authority to deal with the harassment *or* at least to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 549 (7th Cir. 2011) (emphasis added) (internal quotation marks omitted); *see also Parkins*, 163 F.3d at 1035 (holding that a complainant can put her employer on notice either by using the "designated [] channel for complaints of harassment" or by complaining to "someone that the complainant *reasonably believed* was authorized to receive and forward (or respond to) a complaint of harassment") (internal quotation marks omitted).  In other words, the alleged harassment "must either [] come to the attention of someone who (a) has under the terms of his employment, or (b) is *reasonably believed* to have … a duty to pass on the information to someone within the company who has the power to do something about it." *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997) (emphasis added).

Elliott maintains that she reported Barr's harassment pursuant to the Board's sexual harassment policy, as the policy allows employees to make complaints of harassment to "[t]he department head of the Complainant's office," Doc. 76 at ¶ 26, and Dereef was, in her view, the head of the security department at Al Raby.  Doc. 80 at 8-11.  The Board responds that its policy requires "[s]chool-based employees, like [Elliott], … to make th[eir] report to either the principal of the school she worked in or to the EOCO."  Doc. 75 at 7-9.  But that is not what the policy in fact says.  Rather, the policy allows an employee to report harassment to her department head

and requires that "[a]ny … department head … receiving an oral or written complaint alleging … sexual harassment … must refer it to the EOCO for handling within three (3) business days following receipt or knowledge of the allegations."  Doc. 76 at ¶ 26; Doc. 76-11 at 5-6, §§ IV.C, E.

According to Skanes, although the term was used loosely and Dereef was not the head of a "CPS department," he *was* a "department head," Doc. 76 at ¶ 37; Doc. 81 at p. 21, ¶ 31.  In addition, Dereef described himself to Elliott as a department head and the person "over security" to whom she should report.  Doc. 81 at p. 19, ¶ 12.  Under a reasonable interpretation of the Board's policy, Elliott complied with its reporting requirements by complaining to Dereef every two to three weeks from the beginning of the 2015-2016 school year through March 2017.  *Id*. at p. 20, ¶ 14.  Even if Dereef was only the head of the athletics department and not the "department head of [Elliott's] office," the policy required "*[a]ny* … department head" to refer complaints to the EOCO within three days.  Doc. 76 at ¶ 26 (emphasis added).  Thus, Elliott brought the alleged harassment to "the attention of someone who [] has under the terms of his employment … a duty to pass on the information to someone within the company who has the power to do something about it."  *Young*, 123 F.3d at 674; *see also Nischan*, 865 F.3d at 932 ("[The employer] is accountable to the standard of care that it created for itself.  Because [its] rules required Blackman to report the sexual harassment that she observed, [the employer] had constructive notice of the harassment.").  It follows that Elliott's complaints to Dereef put the Board on constructive notice of Barr's harassment.

Even if Elliott's complaints to Dereef did not comply with the policy's reporting requirements, she still put the Board on notice for Title VII purposes because Dereef could "reasonably [have been] expected [by Elliott] to refer the complaint up the ladder to the

employee authorized to act on it." *Yancick*, 653 F.3d at 549. Dereef assured Elliott that he would take care of the harassment and directed her to report any problems to him. Doc. 81 at pp. 19-20, ¶¶ 12-13. Elliott also reported to Dereef, who interviewed Elliott for her position, supervised security staff, could make disciplinary recommendations, and provided input on the security staffs' performance reviews. *Id*. at pp. 18-19, ¶¶ 1, 4-5. Dereef's supervisory role and his role in hiring her, as well as his assurances that he was the person to whom she should report any issues and that he would take care of Barr's harassment, made it eminently reasonable for Elliott to expect that he would either remedy the harassment himself or convey her complaint to someone who could—or at least a reasonable jury could so find. *See Lambert v. Peri Formworks Sys., Inc*., 723 F.3d 863, 866-68 (7th Cir. 2013) (holding that a jury could find that it was reasonable for the complainant to expect "yard leads," who were not supervisors for purposes of strict liability but who served as on-site managers and "st[ood] higher in the chain of authority" than the complainant, to refer his complaint to someone who could address the problem).

The Board retorts that even if it initially was reasonable for Elliott to report Barr's harassment to Dereef, that reasonableness dissipated when her complaints failed to alleviate the harassment. Doc. 83 at 10-12. True enough, the Seventh Circuit held in *Parkins* and *Yancick* that the reasonableness of reporting harassment to a particular employee can "evaporate[] when [the complainant's] requests for relief [go] unanswered." *Parkins*, 163 F.3d at 1038; *see also Yancick*, 653 F.3d at 549-550 (same). In both *Yancick* and *Parkins*, however, there was no indication that the employees to whom the complainant reported responded in any material way to the reports, much less affirmatively accepted responsibility for taking care of the harassment. *See Yancick*, 653 F.3d at 540; *Parkins*, 163 F.3d at 1031. Indeed, in *Yancick*, the employee to whom the complainant reported told the complainant that he "could not do anything" unless

15

there was a witness and that if the complainant did not have a witness, "don't bother me. You're just wasting my time." *Yancick*, 653 F.3d at 540. By contrast, Dereef affirmatively assured Elliott that he would take care of the harassment and directed her to report any issues to him. Doc. 81 at pp. 19-20, ¶¶ 12-13. In addition, in response to Elliott's repeated complaints, Dereef changed her reporting chain so that she reported directly to him instead of to Barr. *Id.* at p. 20, ¶ 16. As Elliott's complaints to Dereef did not go completely "unanswered," and given Dereef's explicit assurances that he would take care of the harassment and that Elliott could report any issues to him, a reasonable jury could find that the reasonableness of her continuing to report Barr's misconduct to Dereef did not dissipate.

Last, viewing the facts in Elliott's favor, a reasonable jury could find that the Board's response to Barr's grossly inappropriate comments, from April 2015 through March 16, 2017, was not "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Cole*, 838 F.3d at 898. True enough, Skanes conducted a routine review of the sexual harassment policy with the security staff in Spring 2015, after which Barr's inappropriate comments stopped for several months. Doc. 76 at ¶¶ 38, 42, 45; Doc. 76-4 at 9. But as noted, that meeting was not a "corrective action" because it was not undertaken in response to Barr's harassment, of which Skanes was not yet aware. *See Ford*, 942 F.3d at 853-54 (holding that an "incidental" action "not calculated to address the harassment does not necessarily affect a hostile work environment claim against the employer"). In any event, Barr's comments started up again within the first week of the following school year. Doc. 76 at ¶ 50; Doc. 81 at p. 19, ¶ 8. And although Dereef directed Elliott to report to him instead of to Barr and spoke to Barr about his behavior, those actions were woefully ineffective in stopping the harassment. Doc. 81 at p. 20, ¶¶ 13-14, 16-17; *see Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 954 (7th Cir. 2005) ("[A]lthough

Title VII does not require that the employer's responses to a plaintiff's complaints …
successfully prevent [ ] subsequent harassment, the efficacy of an employer's remedial action is
material to our determination whether the action was reasonably likely to prevent the harassment
from recurring.") (internal quotation marks and citation omitted).

Accordingly, Elliott's Title VII hostile work environment claim for the period of April
2015 through March 16, 2017 survives summary judgment and will proceed to trial.  By contrast,
no reasonable jury could find that the Board's response to Barr's grabbing Elliott's breast on
March 17 was negligent, as its actions were reasonably calculated to, and in fact did, prevent
further harassment.  "A prompt investigation is the first step toward a reasonable corrective
action," *Cole*, 838 F.3d at 898, and the Board and its agents—including Dereef, Skanes, and the
EOCO—quickly responded to and facilitated a thorough investigation of Elliott's complaint
about the March 17 incident.  Dereef reported the incident to Skanes as soon as Elliott reported it
to him, and Skanes immediately spoke with Elliott and asked whether she wanted to submit an
official complaint.  Doc. 76 at ¶¶ 57-58, 60.  Skanes submitted Elliott's written complaint to the
EOCO two days after receiving it, *id*. at ¶¶ 61-62, and that day, the EOCO contacted Elliott and
provided her with the forms required to initiate a formal EOCO complaint, *id*. at ¶ 64.  The day
after Elliott submitted the required forms, Skanes provided her with the phone number of Leak,
the EOCO investigator assigned to her case, and followed up with Leak on her behalf.  *Id*. at
¶ 66.  Skanes further facilitated the EOCO investigation by providing Leak with space at Al
Raby to conduct interviews.  *Id*. at ¶ 68.  Leak interviewed Elliott, Dereef, and Barr, as well as
five other Al Raby staff, between May 10—seven business days after Elliott initiated her formal
EOCO complaint—and about June 6.  *Id*. at ¶¶ 65, 69.

In addition to conducting a timely and thorough investigation, Leak assured Elliott that she was not the problem and should not be forced to leave Al Raby to escape Barr's harassment. *Id*. at ¶ 70. And when the EOCO substantiated Elliott's complaint in July, the Board prohibited Barr (who had retired in June) from ever being re-hired or volunteering for the Board, and Skanes made clear to Dereef that Barr was not allowed to enter Al Raby's premises or volunteer for any Al Raby activities. *Id*. at ¶¶ 72-73, 75-76. Barr's exclusion from being re-hired or volunteering at any CPS schools, and his specific exclusion from Al Raby's premises, were more than reasonably likely to prevent his harassment of Elliott from recurring, and no reasonable jury could find otherwise. *See Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 384-85 (7th Cir. 2012) (affirming summary judgment where the employer promptly investigated the plaintiff's complaint, forbade the harasser from contacting students, and barred the harasser from campus after he again contacted the plaintiff).

That Elliott was required to keep working with Barr after March 17 does not undermine that conclusion. Doc. 81 at p. 20, ¶ 18. Barr did not harass Elliott after March 17, and Skanes's and the EOCO's prompt attention to and investigation of his conduct could reasonably be expected to prevent further harassment. *See Milligan*, 686 F.3d at 385 ("[The employer] [i]s not required to completely insulate [the complainant] from [the harasser]. Rather, the law require[s] only that [the employer's] response be 'reasonably likely to prevent future harassment.'") (quoting *Parkins*, 163 F.3d at 1036) (citations omitted). Accordingly, the Board is granted summary judgment on Elliott's Title VII hostile work environment claim as it relates to Barr's harassment and the Board's response from March 17, 2017 forward.

## II.    IIED Claim

To state an IIED claim under Illinois law, a plaintiff must allege facts sufficient to show: (1) "conduct [that is] truly extreme and outrageous"; (2) that the defendant "intend[ed] that his

conduct inflict severe emotional distress, or know that there [was] at least a high probability that his conduct [would] cause severe emotional distress"; and (3) that "the conduct … in fact cause[d] severe emotional distress." *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988) (emphases omitted); *see also Lopez v. City of Chicago*, 464 F.3d 711, 720 (7th Cir. 2006) (same), *abrogated on other grounds by Williams v. Dart*, 967 F.3d 625 (7th Cir. 2020). "An employer may be vicariously liable for the tort of an employee if the tort is committed within the scope of the employment. For conduct to be within the scope of employment it must: (1) be of the kind the employee is employed to perform; (2) occur substantially within the authorized time and space limits; and (3) be performed, at least in part, by a purpose to serve the master." *Boston*, 816 F.3d at 467 (citing *Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 991 (Ill. 2007)).

The Board argues that it "cannot be vicariously liable for Barr's conduct under the doctrine of *respondeat superior* because he was acting outside the scope of his employment." Doc. 75 at 13-14. Illinois law holds that sexual harassment falls outside the scope of employment as a matter of law. *See Deloney v. Bd. of Educ. of Thornton Twp.*, 666 N.E.2d 792, 797-98 (Ill. App. 1996) ("[A]cts of sexual assault are outside the scope of employment.") (collecting cases); *Krause v. Turnberry Country Club*, 571 F. Supp. 2d 851, 864 (N.D. Ill. 2008) ("Illinois courts have consistently held that acts of sexual assault and misconduct are outside the scope of employment as a matter of law.") (collecting cases); *Graham v. McGrath*, 363 F. Supp. 2d 1030, 1034 (S.D. Ill. 2005) ("Illinois courts have consistently held that sexual misconduct of employees is outside the express or implied authority of their employment, relieving the employer of any liability under the doctrine of respondeat superior.") (collecting cases). Because Barr's harassment of Elliott fell outside the scope of his employment, the Board

19

cannot be vicariously liable for his tortious conduct for purposes of her IIED claim. *See Boston*, 816 F.3d at 467.

Elliott argues that "[w]hile it is generally true that … an employer is not vicariously liable for the sexual harassment or assault of employees as a matter of law, where an employer has notice of the conduct and does nothing it can be deemed to have ratified the conduct so that liability is properly imposed on the employer." Doc. 80 at 14. In support, Elliott cites *Zuidema v. Raymond Christopher, Inc*., 866 F. Supp. 2d 933, 938 (N.D. Ill. 2011), and *Benitez v. Am. Standard Cirs., Inc*., 678 F. Supp. 2d 745, 765-66 (N.D. Ill. 2010). Those cases, in turn, rely on decisions from this District holding that injuries are not "accidental" under the Illinois Workers' Compensation Act ("IWCA"), and thus are not barred under that statute, if they were "commanded or expressly authorized by the employer," as when an employer "knew of [the harassment] and did nothing." *Thomas v. Habitat Co*., 213 F. Supp. 2d 887, 892 (N.D. Ill. 2002) (quoting *Meerbrey v. Marshall Field & Co., Inc*., 564 N.E.2d 1222, 1225 (Ill. 1990)); *see also Quela v. Payco-Gen. Am. Credits, Inc*., 84 F. Supp. 2d 956, 960 (N.D. Ill. 2000) (same); *Mobley v. Kelly Kean Nissan, Inc*., 864 F. Supp. 726, 730 (N.D. Ill. 1993) (holding that, where the employer "had been notified of the harassment and chose to do nothing," claims for emotional distress and loss of reputation were "not preempted by the IWCA"); *Cline v. Gen. Elec. Cap. Auto Lease, Inc*., 757 F. Supp. 923, 931 (N.D. Ill. 1991) (holding that an employee's "battery was not 'accidental' within the meaning of the Illinois Workers' Compensation Act" when the employer was "not only was aware of [an employee's] mistreatment of his employees, [but also] tolerated it"). None of those cases establish that an employer can be vicariously liable for its employee's torts committed outside the scope of employment; rather, they hold only that tort claims are not preempted by the IWCA when the employer had notice of the employee's tortious

conduct and did nothing to address it. There accordingly is no basis for holding the Board vicariously liable for Barr's alleged intentional infliction of emotional distress, as his sexually harassing conduct fell outside the scope of his employment.

Accordingly, the Board is granted summary judgment on Elliott's IIED claim.

## Conclusion

The Board's summary judgment motion, as well as its motion to strike facts and to deem facts admitted, is granted in part and denied in part. The Board is granted summary judgment on Elliott's IIED claim and her Title VII hostile work environment claim as it relates to conduct from March 17, 2017 forward. This case will proceed to trial on Elliott's Title VII claim as it relates to conduct through March 16, 2017.

March 24, 2022

_____
United States District Judge